# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION        )
CENTER,                                )
                                       )
            Plaintiff,                 )   No. 1:12-cv-01282 (JEB)
                                       )
         V.                            )
                                       )
OFFICE OF THE DIRECTOR OF              )
NATIONAL INTELLIGENCE,                 )
                                       )
            Defendant.                 )
_____)

### DECLARATION OF MARK W. EWING,
### CHIEF MANAGEMENT OFFICER,
### OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

Pursuant to 28 U.S.C. § 1746, I, Mark W. Ewing, declare the following to be true and correct:

1.  I am the Chief Management Officer ("CMO") for the Office of the Director of National Intelligence ("ODNI").  I have held this position since August 2010.  I am also the Chief Freedom of Information Act ("FOIA") Officer for the ODNI.  Prior to my current position, within the ODNI, I served as Senior Advisor to the Director of the Intelligence Staff, as Assistant Deputy Director for Plans, Policy and Requirements, and as Assistant Deputy Director for Customer Outcomes.  Before arriving at the ODNI, I served for five years as Deputy Director of the Defense Intelligence Agency ("DIA") and, prior to DIA,

for five years as the Assistant Deputy Chief of Staff for Intelligence, Department of the Army.

2.   In addition, I have TOP SECRET original classification authority delegated to me by the Director of National Intelligence ("DNI") pursuant to Section 1.3 of Executive Order ("E.O.") 13526.  I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions.

3.   Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA requests.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

4.   I am submitting this Declaration in support of the ODNI's motion for summary judgment in this proceeding.  The purpose of this Declaration is to address several issues alleged in plaintiff's Complaint, and to explain and justify, to the extent possible on the public record, the ODNI's actions in responding to plaintiff's requests for information under the FOIA, 5 U.S.C. § 552, as amended.

## I.   ODNI BACKGROUND

5.   Congress created the position of the DNI in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub.

L. No. 108-458, §§ 1011(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending Sections 102 through 104 of Title I of the National Security Act of 1947).  Subject to the authority, direction, and control of the President, the DNI serves as the head of the U.S. Intelligence Community ("IC") and as the principal advisor to the President and the National Security Council for intelligence matters related to the national security.  50 U.S.C. §§ 403(b)(1), (2).

6.   The responsibilities and authorities of the DNI are set forth in the National Security Act of 1947, as amended.  These responsibilities include ensuring that national intelligence is provided to the President, heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof.  50 U.S.C. § 403-1(a)(1).  The DNI is charged with establishing the objectives of; determining the requirements and priorities for; and managing and directing the tasking, collection, analysis, production, and dissemination of national intelligence by elements of the IC.  50 U.S.C. §§ 403-1(f)(1)(A)(i) and (ii).

7.   In addition, the National Security Act of 1947, as amended, states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized

disclosure." 50 U.S.C. § 403-1(i)(1).  Consistent with this

responsibility, the DNI establishes and implements guidelines

for the IC for the classification of information under

applicable law, Executive orders, or other Presidential

Directives and for access to and dissemination of intelligence.

50 U.S.C. §§ 403-(i)(2)(A), (B).

    8.  Finally, the National Security Act of 1947, as amended,

created an Office of the Director of National Intelligence.  The

function of this Office is to assist the DNI in carrying out the

duties and responsibilities of the DNI under the Act and other

applicable provisions of law, and to carry out such other duties

as may be prescribed by the President or by law.

## II.  ADMINISTRATIVE PROCESSING OF PLAINTIFF'S REQUESTS

### A.  DF-2012-00059

    9.  By letter dated March 28, 2012, the ODNI received a

FOIA request from Ginger P. McCall of the Electronic Privacy

Information Center ("plaintiff") seeking, in general, ODNI

documents regarding the acquisition of databases from other

intelligence agencies as described in the Guidelines for Access,

Retention, Use, and Dissemination by the National

Counterterrorism Center ("NCTC") and Other Agencies of

Information in Datasets Containing Non-Terrorism Information

("AG Guidelines").  Specifically, plaintiff sought "the

'priority list' of databases that the National Counterterrorism Center plans to copy." (A copy of plaintiff's March 28, 2012 request letter is attached hereto as Exhibit A.)

10. Plaintiff's request was assigned case #DF-2012-00059 and was placed in the ODNI's normal processing queue. By letter dated March 29, 2012, the ODNI accepted plaintiff's request and agreed to process it in accordance with the FOIA, 5 U.S.C. § 552, as amended. (A copy of ODNI's March 29, 2012 acceptance letter is attached hereto as Exhibit B.)

11. By letter dated June 8, 2012, the ODNI received a letter from plaintiff appealing ODNI's failure to respond to their request within 20 days. (A copy of plaintiff's June 8, 2012 appeal letter is attached hereto as Exhibit C.)

12. By letter dated June 15, 2012, the ODNI accepted plaintiff's appeal and agreed to process it in accordance with the FOIA, 5 U.S.C. § 552, as amended. (A copy of ODNI's June 15, 2012 appeal acceptance letter is attached hereto as Exhibit D.)

13. The plaintiff filed the instant Complaint on August 1, 2012.

14. On or about October 12, 2012, the Department of Justice ("DOJ") reached an agreement with the plaintiff on

limiting the scope of their requests that will be discussed in
more detail below[1].

15.   By letter dated December 14, 2012, the ODNI issued its
response to the plaintiff's request #DF-2012-00059 and notified
plaintiff that it located three documents responsive to their
request and released them in segregable form with deletions made
pursuant to FOIA Exemptions 1, 3, 5, and/or 7(E), 5 U.S.C. § 552
(b)(1), (b)(3), (b)(5), and (b)(7)(E).  (A copy of ODNI's
December 14, 2012 response letter is attached hereto as Exhibit
E.)

16.   By letter dated May 8, 2013, the ODNI issued a
supplemental final response to the plaintiff's request #DF-2012-
00059 and notified plaintiff that it decided to release more
information in two of the three previously released in part
documents.  The ODNI determined, however, that some information
in those two documents must continue to be protected pursuant to
FOIA Exemptions 1, 3, 5, and 7(E), 5 U.S.C. § 552 (b)(1),
(b)(3), (b)(5), and (b)(7)(E).  (A copy of ODNI's May 8, 2013
final response letter is attached hereto as Exhibit F.)

   **B.   DF-2012-00090**

---

[1]Plaintiff filed four separate FOIA requests which are all at issue in this
case and identified as DF-2012-00059, DF-2012-00090, DF-2012-00091, and DF-
2012-00092. However, the limitations were not in effect for their request
#DF-2012-00059.

17.   By letter dated June 15, 2012, the ODNI received a
FOIA request from the plaintiff seeking information on the AG
Guidelines.   Specifically, plaintiff requested the following:
1. "The guidelines and mechanisms for the correction or
documentation of 'inaccuracy or unreliability of [] information,
and supplement incomplete information to the extent additional
information becomes available;'" 2. "Training materials used to
'ensure that [] personnel use the datasets only for authorized
NCTC purposes and understand the baseline and enhanced
safeguards, dissemination restrictions, and other privacy and
civil liberties protections they must apply to each such
dataset;'" 3. "Any information or documentation related to
abuse, misuse, or unauthorized access of datasets acquired by
NCTC (as indicated by the monitoring, recording, and auditing
described in Section (C)(3)(d)(3));" and 4. "Written
determinations by the Director of NCTC or designee regarding
'whether enhanced safeguards, procedures, and oversight
mechanisms are needed.'"   (A copy of plaintiff's June 15, 2012
request letter is attached hereto as Exhibit G.)

18.   Plaintiff's request was assigned case #DF-2012-00090
and was placed in the ODNI's normal processing queue.   By letter
dated July 5, 2012, the ODNI accepted plaintiff's request and
agreed to process it in accordance with the FOIA, 5 U.S.C.

7

§ 552, as amended.  (A copy of ODNI's July 5, 2012 acceptance
letter is attached hereto as Exhibit H.)

19.   Following the filing of the instant Complaint on
August 1, 2012, and in accordance with the negotiated agreement
between plaintiff and DOJ, by letter dated February 12, 2013,
the ODNI issued an interim response to the plaintiff's request.
With respect to items 1 and 4, the ODNI notified plaintiff that
it was unable to locate any information responsive to their
request.  With respect to item 2, four responsive documents were
located and were released in segregable form with deletions made
pursuant to FOIA Exemptions 1, 2, 3, and/or 6, 5 U.S.C. § 552
(b)(1), (b)(2), (b)(3), and (b)(6).  With respect to item 3, the
ODNI advised plaintiff that responsive material was located, was
under review via coordination with other government agencies,
and a final response would be provided once that review and
external coordination process was completed. (A copy of ODNI's
February 12, 2013 interim response letter is attached hereto as
Exhibit I.)

20.  By letter dated March 11, 2013, the ODNI issued an
additional interim response to plaintiff's request #DF-2012-
00090.  With respect to item 3, the ODNI notified plaintiff that
it located 22 documents, one of which could be released in
segregable form with deletions made pursuant to FOIA Exemptions

1, 3, and 6, 5 U.S.C. § 552 (b)(1), (b)(3), and (b)(6).  The

remaining 21 documents were denied in full based on FOIA

Exemptions 1, 2, 3, 5, and/or (6), 5 U.S.C. § 552 (b)(1),

(b)(2), (b)(3), (b)(5), and (b)(6)[2].  The ODNI advised plaintiff

that all of those documents were not technically responsive to

their request because they involved potential compliance

incidents other than those related to the specific provision of

the revised 2012 AG Guidelines (i.e., Section

[III.](C)(3)(d)(3)) cited in their FOIA request.  However,

because they fell within the time period of the ODNI's search

and related to compliance matters generally, the ODNI processed

them as a matter of agency discretion.  (A copy of ODNI's

March 11, 2013 interim response letter is attached hereto as

Exhibit J.)

     21.  By letter dated May 8, 2013, the ODNI issued a

supplemental final response to the plaintiff's request #DF-2012-

00090 and notified plaintiff that it decided to release more

information in one of the four previously released in part

documents responsive to item 2.  The ODNI determined, however,

that some information in that document must continue to be

protected pursuant to FOIA Exemptions 1, 2, 3, and 6, 5 U.S.C.

§ 552 (b)(1), (b)(2), (b)(3), and (b)(6).  (A copy of ODNI's

---

[2] The ODNI is now also denying these documents based on FOIA Exemption 7(E).

May 8, 2013 final response letter is attached hereto as Exhibit
K.)

### C.   DF-2012-00091

22.  By letter dated June 14, 2012, the ODNI received a
FOIA request from the plaintiff seeking information on the AG
Guidelines.  Specifically, plaintiff requested the following:
1. "Terms and Conditions related documents, as described in
Section (B)(2)(a) of the NCTC Guidelines;" and 2. "All documents
related to disputes between department and agency heads and DNI,
as described under Section (B)(2)(d) of the NCTC Guidelines."
(A copy of plaintiff's June 14, 2012 request letter is attached
hereto as Exhibit L.)

23.  Plaintiff's request was assigned case #DF-2012-00091
and was placed in the ODNI's normal processing queue.  By letter
dated July 5, 2012, the ODNI accepted plaintiff's request and
agreed to process it in accordance with the FOIA, 5 U.S.C.
§ 552, as amended.  (A copy of ODNI's July 5, 2012 acceptance
letter is attached hereto as Exhibit M.)

24.  By letter dated July 19, 2012, the ODNI received a
letter from plaintiff appealing ODNI's failure to respond to
their request within 20 days.  (A copy of plaintiff's
July 19, 2012 appeal letter is attached hereto as Exhibit N.)

25.   By letter dated August 14, 2012, the ODNI accepted plaintiff's appeal and agreed to process it in accordance with the FOIA, 5 U.S.C. § 552, as amended.  (A copy of ODNI's August 14, 2012 appeal acceptance letter is attached hereto as Exhibit O.)

26.   Following the filing of the instant Complaint on August 1, 2012, and in accordance with the negotiated agreement between plaintiff and DOJ, by letter dated February 12, 2013, the ODNI issued a final response to the plaintiff's request. The ODNI notified plaintiff that it was unable to locate any information responsive to their request.  (A copy of ODNI's February 12, 2013 final response letter is attached hereto as Exhibit P.)

   **D.   DF-2012-00092**

27.   By letter dated June 15, 2012, the ODNI received a FOIA request from the plaintiff seeking information on the AG Guidelines.  Specifically, plaintiff requested the following: "Any guidelines or legal memoranda discussing NCTC's understanding and interpretation of the following standards used in the NCTC Guidelines discussed above:  'reasonably believed to constitute terrorism information,' 'reasonably believed to contain terrorism information,' and 'likely to contain

11

significant terrorism information.'" (A copy of plaintiff's June 15, 2012 request letter is attached hereto as Exhibit Q.)

28.  Plaintiff's request was assigned case #DF-2012-00092 and was placed in the ODNI's normal processing queue. By letter dated July 5, 2012, the ODNI accepted plaintiff's request and agreed to process it in accordance with the FOIA, 5 U.S.C. § 552, as amended.  (A copy of ODNI's July 5, 2012 acceptance letter is attached hereto as Exhibit R.)

29.  Following the filing of the instant Complaint on August 1, 2012, and in accordance with the negotiated agreement between plaintiff and DOJ, by letter dated February 12, 2013, the ODNI issued a final response to the plaintiff's request. The ODNI notified plaintiff that it was unable to locate any information responsive to their request.  (A copy of ODNI's February 12, 2013 final response letter is attached hereto as Exhibit S.)

30.  In Part III of this Declaration I will explain ODNI's searches regarding plaintiff's requests, and in Part IV I will describe ODNI's withholdings and will outline the bases for the FOIA exemptions asserted in this case.

III. **SEARCHES FOR RESPONSIVE RECORDS**

31.  DOJ negotiated with plaintiff to narrow the scope of their requests as follows:  1) to define their requests to

pertain only to records related to the revised AG Guidelines of
March 2012 (as opposed to the original AG Guidelines that went
into effect in 2008); and 2) to limit their requests, to the
extent such a limit makes logical sense, to documents that are
final and not predecisional or deliberative in nature.   In
response to plaintiff's demand for a description of what the
ODNI meant by "final" documents, the ODNI explained as follows:

a.   For item 1 of request #DF-2012-00090, the request
was limited only to "guidelines" or "mechanisms" that
either: 1) formally established policies or procedures
to be followed by the agency or 2) described policies
or procedures that were actually followed by the
agency.

b.   For item 2 of request #DF-2012-00090, the request
was limited to only the final versions of materials
used for or intended to be used for training and to
exclude any draft training materials.

c.   For item 3 of request #DF-2012-00090, the limit
was not in effect (however, because the request was
limited only to information or documentation generated
by the auditing described in the AG Guidelines, as
opposed to informal or external reports, complaints,

rumors, etc., any responsive documents (it was thought) would likely be "final" in any event).

d.   For item 4 of request #DF-2012-00090, the request was limited to only formal determinations or decisions, and not any deliberative or predecisional materials.

e.   For item 1 of request #DF-2012-00091, the request was limited to terms and conditions or other procedures "govern[ing] access to or acquisition of datasets" under the AG Guidelines that were either followed or constituted a policy to be followed by the agency.

f.   For item 2 of request #DF-2012-00091, the request was limited to written objections from the head of a department or agency or the DNI, as described in Guideline Section (B)(2)(a), and any formal response to such an objection.

g.   For request #DF-2012-00092, the request was limited to guidelines or memoranda that set forth a standard to be followed or a standard actually followed for the terms described and to exclude any draft guidelines or memoranda.

32.   After receipt of plaintiff's FOIA requests, and
following the narrowing agreement identified above, ODNI's
Information and Data Management Group ("IDMG"), which receives,
processes, and responds to requests for ODNI records under the
FOIA, began to coordinate within the ODNI how the requests
should be handled, including where searches should be performed
within the ODNI.   IDMG identified all offices within the ODNI
likely to possess records responsive to plaintiff's requests and
sent out search taskings on October 26, 2012.   Searches were
conducted in the following ODNI offices:   NCTC/Missions Systems,
NCTC/Information Sharing Program and Policy Office, NCTC/Civil
Liberties and Privacy Office, NCTC/Executive Secretariat and
NCTC/Legal (collectively referred to as "NCTC"), the Executive
Secretariat ("ExecSec"), the Office of General Counsel ("OGC"),
and the Civil Liberties and Privacy Office ("ODNI CLPO").   These
offices were selected for search because their duties and
responsibilities are such that it was reasonably likely that
individual employees within these offices would have been
involved in the effort to devise and implement the revised 2012
AG Guidelines.   Given the nature and scope of plaintiff's
requests, no other offices within the ODNI would reasonably be
expected to possess responsive documents.

33.   Individuals in these offices were provided copies of and a summary of the requests and asked to search their electronic and hard copy files for responsive records between the dates of March 22, 2012 (the date the revised Guidelines went into effect) and October 26, 2012 (the date of tasking). Most of the individuals tasked to conduct a search notified IDMG that they retained AG Guidelines documents in hardcopy and/or known repositories and folders in both their classified and unclassified email accounts and shared drives, and that a separate 'search term' search was unnecessary.   However, in an effort to be as comprehensive as possible, some of these individuals also performed electronic searches of their classified and unclassified emails and shared drives using search terms such as "AG Guidelines," "Guidelines," "Attorney General Guidelines," "NCTC Guidelines," "CTDL," "Data Layer," "CT Data Layer," "Datasets," "Ingest," and "MOU."

34.   After these individuals performed their searches they either forwarded responsive records or advised IDMG that they did not locate any responsive records.   As records were located and forwarded to IDMG, the FOIA analyst handling this case, in consultation with attorneys in OGC, conducted a continual analysis and review of the documents located to determine if they were in fact responsive to the requests.   Review of these

16

records did not suggest that searching additional components, offices, or individuals within the ODNI would reasonably be expected to locate additional responsive documents.  The ODNI located 29 documents, totaling 212 pages, which were determined to be 'responsive' to plaintiff's requests.[3]

35.  As of the search cut-off date, October 26, 2012, NCTC had not yet implemented the revised 2012 Guidelines with regard to replication of data under Track 3[4] of the 2012 Guidelines because it was (and is still) in the process of developing, refining and finalizing the new safeguards and compliance mechanisms required by the 2012 AG Guidelines to protect privacy and civil liberties within this Track 3 data.  Likewise, NCTC was (and is still) in the process of renegotiating its information-sharing agreements with data providers in the U.S. Government in order to ensure that those agreements incorporate

---

[3] Some records were not technically responsive to item 3 of plaintiff's request #DF-2012-00090 because they involved potential compliance incidents other than those related to the specific provision of the 2012 revised AG Guidelines (i.e., Section [III.](C)(3)(d)(3)) cited in plaintiff's request. As a matter of agency discretion, and because they fell within the time period of ODNI's search and related to compliance matters generally, the ODNI processed them anyway.

[4] There are three methods – or "tracks" – through which NCTC can access data under the 2012 AG Guidelines.  Track 1 encompasses account-based access, wherein NCTC is given accounts on the native systems of individual data providers.  Track 2 involves NCTC providing query terms to a data provider, which the data provider then uses to run queries on its own systems, after which the responsive hits are provided to NCTC for further analysis.  Track 3 access entails replication of a dataset, or a significant portion of a dataset, within NCTC's own systems.

all of the new requirements of the 2012 revised AG Guidelines.
Therefore, since the 2012 AG Guidelines had not (and have not)
yet been implemented with regard to Track 3 data, and since
almost all of the information requested in plaintiff's FOIA
requests pertains to processes and safeguards specifically
related to these Track 3 datasets, and since plaintiff's
requests were further limited, for the most part, to final
documents related to the 2012 AG Guidelines, only 29 documents
were located in response to plaintiff's four FOIA requests.

## IV.   EXPLANATION OF WITHHELD MATERIAL

36.  As mentioned above, the ODNI located 29 documents in
response to plaintiff's four requests.[5]  For plaintiff's request
#DF-2012-00059, the ODNI located three documents, totaling seven
pages, and released them to the plaintiff in segregable form
with deletions made pursuant to FOIA Exemptions 1, 3, 5, and
7(E).  For plaintiff's request #DF-2012-00090, the ODNI located
four documents with respect to item 2, totaling 162 pages, and
released them to the plaintiff in segregable form with deletions
made pursuant to FOIA Exemptions 1, 2, 3, and/or 6; and located
22 documents with respect to item 3, totaling 43 pages, and
released one document to the plaintiff in segregable form with
deletions made pursuant to FOIA Exemptions 1, 3, and 6, but

_____

[5] The ODNI did not locate any responsive documents to plaintiff's requests
#DF-2012-00091 and DF-2012-00092.

denied in full 21 documents based on FOIA Exemptions 1, 2, 3, 5

6, and/or 7(E).[6]

37.   For ease of reference, the following is a list of all

29 documents (descriptions of which are detailed, *infra*):

     a.   DF-2012-00059

        i.   "Counterterrorism Data Layer (CTDL): Status of Data Ingestion of Track 3 Datasets, October 2011" – (three pages) released in part with deletions made pursuant to FOIA Exemptions 1, 3, 5, and 7(E).

        ii.   "Counterterrorism Data Layer (CTDL): Datasets Ingested for Evaluation for Ingestion Pursuant to Track 3 of the NCTC Specific USP Guidelines, October 2011" – (three pages) released in part with deletions made pursuant to FOIA Exemptions 1, 3, 5, and 7(E).

        iii.   "CT Resource Council, 22 March 2012" – (one page) released in part with deletions made pursuant to FOIA Exemptions 1, 3, 5, and 7(E).

     b.   DF-2012-00090 (item 2)

        i.   "NCTC GUIDELINES: Understanding Acquisition, Retention, and Dissemination of USP Information and other issues in EO 12333" – (32 pages) released in part with deletions made pursuant to FOIA Exemptions 1, 2, 3, and 6.

        ii.   "Data Access and Use, NCTC" – (66 pages) released in part with deletions made pursuant to FOIA Exemptions 1, 2, 3, and 6.

        iii.   "PA101: Privacy Act Safeguarding Personal Information" – (56 pages) released in part with deletions made pursuant to FOIA Exemptions 2 and 3.

---

[6] For items 1 and 4 of DF-2012-00090, the ODNI did not locate any responsive documents.

        iv.  "NCTC Civil Liberties and Privacy Office, Protection of Privacy and Civil Liberties" – (eight pages) released in part with deletions made pursuant to FOIA Exemptions 2, 3, and 6.

   c.  DF-2012-00090 (item 3)

        i.  "Assessment of Compliance Incident: Delayed Deletion of APIS Data" – (five pages) released in part with deletions made pursuant to FOIA Exemptions 1, 3, and 6.

        ii.  "Deletion Issue Trackers" – 11 one-page documents, eight of which are denied in full based on FOIA Exemptions 3, 5 and 7(E), one denied in full based on FOIA Exemptions 3, 5, 6, and 7(E), one denied in full based on FOIA Exemptions 1, 3, 5, 6, and 7(E), and one denied in full based on FOIA Exemptions 2, 3, 5, 6, and 7(E).

       iii. "Deletion Issue Reports" – four documents (eight pages total), three of which are denied in full based on FOIA Exemptions 3, 5, 6, and 7(E), and one denied in full based on FOIA Exemptions 2, 3, 5, 6, and 7(E).

        iv.  "Deletion Issue Tracker Emails" – six documents (19 pages total) denied in full based on FOIA Exemptions 2, 3, 5, 6, and 7(E).

## A. FOIA EXEMPTION 1

38.  Exemption 1 of the FOIA protects from release matters that are specifically authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive order. 5 U.S.C. § 552(b)(1).  The current Executive Order which establishes such criteria is Executive Order 13526 ("E.O. 13526").

39.   Section 1.2(a) of E.O. 13526 provides that information shall be classified at one of three levels.   Information shall be classified at the TOP SECRET level if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.   Information shall be classified at the SECRET level if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security.   Information shall be classified at the CONFIDENTIAL level if its unauthorized disclosure reasonably could be expected to cause damage to the national security.

40.   In addition, information shall not be considered for classification unless it falls within one of the categories described in Section 1.4 of E.O. 13526.   The relevant category for purposes of this case is Section 1.4(c).   Section 1.4(c) allows information to be classified if it pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology."

41.   The three documents that were released in part to plaintiff under their request #DF-2012-00059 contain information that is protected pursuant to FOIA Exemption 1 (and Exemptions 3, 5, and 7(E)) because they include information that is currently and properly classified at the SECRET level.   Two of those documents, one of which is titled "Counterterrorism Data

Layer (CTDL)[7]: Status of Data Ingestion of Track 3 Datasets,
October 2011," and the other "Counterterrorism Data Layer
(CTDL): Datasets Ingested for Evaluation for Ingestion Pursuant
to Track 3 of the NCTC Specific USP Guidelines, October 2011,"
contain classified material including intelligence analysis that
provides specific information regarding sensitive or classified
collection systems and datasets.  The third document titled "CT
Resource Council, 22 March 2012," contains classified material
including the names of specific datasets that were targeted for
possible ingestion into the CTDL, as well as the names of data
provider agencies.  All of the material redacted based on FOIA
Exemption 1 on these three documents is classified at the SECRET
level.  Public disclosure of the collection methods and
information sharing arrangements with other U.S. Government
agencies that are relied upon by NCTC analysts to produce
terrorist intelligence reports, generate law enforcement
investigative leads, and provide essential assessments and
background information to support decisions regarding the
watchlisting of specific individuals would seriously degrade the

---

[7] The CTDL is NCTC's data holdings from external providers and internal
analytic operations, which houses source files from data providers and
structured and unstructured data for replication.  Within the CTDL, data goes
through extract, transform, and load processes and is standardized for
analytical consumption correlation and entity resolution.  The CTDL then
exposes the data to a variety of analytic and search tools, using role-based
access control.

overall effectiveness of U.S. counterterrorism activities. If known or suspected terrorists gained insights into what datasets are routinely reviewed by NCTC to develop essential information concerning a known or suspected terrorist, that knowledge might assist them in identifying gaps and seams in order to evade detection at international ports of entry into the United States or to facilitate their ability to securely engage in international financial transactions.  Terrorist organizations have demonstrated the capacity to gather and analyze information in the public domain and the ability to deduce the intelligence methods employed by the United States.  This concern is particularly relevant to the compilation and maintenance of various watch and screening lists to protect the American public from terrorist attacks using commercial aviation.  If the specific datasets are disclosed, potential terrorists would use that knowledge to develop effective countermeasures and circumvent detection.  While a limited number of Department of Homeland Security ("DHS") datasets used by NCTC analysts have been described publicly in DHS issuances under the Privacy Act, the totality of datasets used by NCTC has not been publicly revealed and must remain classified to prevent the harm identified above.  Information concerning the previously disclosed DHS datasets has not been withheld from the records at

issue in this litigation.  The redacted information relates only
to datasets obtained from other agencies.  Accordingly,
disclosure of this information could reasonably be expected to
cause serious damage to national security and is currently and
properly classified in accordance with E.O. 13526.

42.  In the four documents located and determined
responsive to item 2 of plaintiff's request #DF-2012-00090, only
portions of two documents were protected by FOIA Exemption 1
because they include information that is currently and properly
classified at the SECRET level.  One document titled "NCTC
GUIDELINES: Understanding Acquisition, Retention, and
Dissemination of USP Information and other issues in EO 12333,"
is a training course offered to NCTC analysts as an overview of
NCTC's authorities.  It contains classified information on one
of the 32 pages including examples of intelligence analysis that
provides specific information regarding sensitive or classified
collection systems, and the name of a classified dataset.  The
other document, titled "Data Access and Use, NCTC," is a
training course offered to NCTC analysts to provide them with an
understanding of the authorities and role of the NCTC in the
integration of data for the purpose of identifying terrorism
information and the rules and regulations governing the access,
retention, use and dissemination of that data.  It contains

classified information on six of the 66 pages including examples
of intelligence analysis that provides specific information
regarding sensitive or classified collection systems, and the
names of classified datasets.  All of the material on these two
documents that was redacted on FOIA Exemption 1 grounds is
classified at the SECRET level.  Information redacted from these
training slides concerns highly sensitive collection
methodologies employed in support of U.S. Government
counterterrorism efforts, including special collection
techniques associated with authorized electronic surveillance
and clandestine human intelligence collection activities.
Accordingly, disclosure of this information could reasonably be
expected to cause serious damage to national security and is
currently and properly classified in accordance with E.O. 13526.

43.  In the 22 documents (totaling 43 pages) located in
response to item 3 of plaintiff's request #DF-2012-00090, two
documents contain information that is protected by FOIA
Exemption 1 because they include information that is currently
and properly classified at the SECRET level, including specific
and detailed information concerning assessments of security
systems that indicate vulnerabilities or could aid in
penetration of the system, and/or specific and detailed
information concerning systems security mechanisms that protect

the integrity, confidentiality, and availability of data on ODNI classified systems.

44.    More specifically, one five page document titled "Assessment of Compliance Incident: Delayed Deletion of APIS Data," which was released in part, contains classified information on one page that details the number of records NCTC receives weekly from the Advanced Passenger Information System ("APIS"), a DHS dataset.  Disclosure of statistical data would reveal the extent, duration and frequency of NCTC reviews of travel records contained in the named DHS database and furnish insights into the process and procedures used by NCTC analysts to access and assess these travel records.

45.    The other document that contains classified information is a one page document referred to as a "Deletion Issue Tracker," which is a document created by NCTC to track if and when records in specific datasets were not deleted on time in accordance with the agreement with the data provider agency (including information on the date the issue was identified, the date the record(s) was due to be deleted, the date the record(s) was actually deleted, the number of records deleted, the exposure of access, and a brief description of the issue).  That document was denied in full pursuant to FOIA Exemption 1 (and Exemptions 3, 5, 6, and 7(E)) because it contains information

that must be protected as classified because it reveals the dataset name and the data provider agency.  This particular document includes information that relates to and identifies a human intelligence collection database provided by an IC agency that conducts highly sensitive collection activities involving human sources and reveals details on the size and scope of records available in this database that are currently and properly classified.

46.  I have determined that the information classified at the SECRET level on the six released in part documents and one denied in full document is currently and properly classified because it pertains to intelligence activities, the release of which could be expected to cause serious damage to the national security.  Accordingly, this information must be protected from release pursuant to FOIA Exemption 1.

**B. FOIA EXEMPTION 2[8]**

47.  Exemption 2 of the FOIA protects from release matters that are related solely to the internal personnel rules and practices of an agency. 5 U.S.C. § 552(b)(2).

48.  In the four documents located and determined responsive to item 2 of plaintiff's request #DF-2012-00090, portions of seven of the 162 pages in all four of those

---

[8] All of the information the ODNI protected under FOIA Exemption 2 was also protected under FOIA Exemption 3 and/or 6.

documents were protected by FOIA Exemption 2 because they include information related to ODNI personnel and their internal agency email addresses, phone numbers, room numbers, and website addresses.  Specifically, in the document titled "NCTC GUIDELINES: Understanding Acquisition, Retention, and Dissemination of USP Information and other issues in EO 12333," ODNI employees' phone numbers, room numbers and email addresses appear on one of the 32 pages.  In the document titled "PA101: Privacy Act Safeguarding Personal Information," a training course offered to NCTC analysts to provide them with information on how the Privacy Act of 1974 protects individuals' rights regarding information collected, maintained and disclosed about them by the U.S. Government, and defines Personally Identifiable Information ("PII") and how it is protected, internal ODNI email addresses appear on two of the 56 pages.  In the document titled "Data Access and Use, NCTC," internal ODNI websites and ODNI employees' phone numbers appear on three of the 66 pages.  In the document titled "NCTC Civil Liberties and Privacy Office, Protection of Privacy and Civil Liberties," another training course offered to NCTC analysts that help describe the privacy and civil liberties considerations involved in reviewing U.S. person data in datasets acquired by NCTC, an ODNI employee's

phone number, room number and email address appear on one of the eight pages.

49.   In the 22 documents located in response to item 3 of plaintiff's request #DF-2012-00090, eight of the 21 denied in full documents were protected by FOIA Exemption 2 because they contain information related to ODNI personnel and their internal agency email addresses, phone numbers, and the names of specific internal shared drives and URL links.

50.   ODNI's personnel and their internal agency email addresses, phone numbers, room numbers, website addresses, internal shared drive folder names and URL links all relate solely to the ODNI's internal practices, the disclosure of which would not serve any public interest.  In addition, disclosure could impede the ODNI's effectiveness in carrying out its official business because it could subject ODNI employees to harassing communications that could disrupt official business. Accordingly, this information must be protected from release pursuant to FOIA Exemption 2.

**C. FOIA EXEMPTION 3**

51.   Exemption 3 of the FOIA does not require the production of records that are:  "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A)(i) requires that the matters be

withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph." 5 U.S.C. § 552(b)(3), as amended.

52.   Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1) states that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  The sources and methods provision of the National Security Act has long been held to qualify as an Exemption 3 statute.  In contrast to information withheld pursuant to Exemption 1, agencies are not required to identify and describe the damage to national security that reasonably could be expected to result from the unauthorized disclosure of these sources and methods.  Agencies are only required to establish that the withheld information constitutes intelligence sources and methods.

53.   I have determined that information on 26 of the 29 documents should be protected from disclosure under the sources and methods provision of Section 102A(i)(1) of the National Security Act, as amended.  Knowledge of the sources and methods of an intelligence agency must be protected from disclosure

because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States.  The result of disclosure of a particular source and/or method leads to the neutralization of that source and/or method, whether the source and/or method is used for the collection of intelligence information, the conduct of clandestine activities, or the analysis and evaluation of intelligence information.

54.  Specifically, information on the three released in part documents in DF-2012-00059, one of the four released in part documents responsive to item 2 of DF-2012-00090, one released in part document with regard to item 3 of DF-2012-00090, and all 21 denied in full documents with regard to item 3 of DF-2012-00090 pertain to intelligence sources and methods that clearly fall within the ambit of and therefore must be protected by the National Security Act, as amended.  As indicated above, although no harm rationale is required, the release of this information, which includes the names of specific datasets and data provider agencies, would provide unauthorized persons with the means to piece together sensitive and/or classified information in order to determine the nature and scope of an IC agency's classified intelligence interest in particular U.S. person information related to terrorism.

Additionally, disclosure of the data contained on these documents would assist adversaries in piecing together bits of information that would provide insights into the particular sources and methods relied upon by NCTC analysts to produce terrorist intelligence reports, generate law enforcement investigative leads, and provide essential assessments and background information to support decisions regarding the watchlisting of specific individuals.  Public disclosure of the collection methods and information sharing arrangements with other U.S. Government agencies would seriously degrade the overall effectiveness of U.S. counterterrorism activities. If known or suspected terrorists gained insights into what datasets are routinely reviewed by NCTC to develop essential background information concerning a known or suspected terrorist, that knowledge might assist them in identifying gaps and seams in order to evade detection at international ports of entry into the United States or to facilitate their ability to securely engage in international financial transactions.  Terrorist organizations have demonstrated the capacity to gather and analyze information in the public domain and the ability to deduce the intelligence methods employed by the United States. This concern is particularly relevant to the compilation and maintenance of various watch and screening lists to protect the

American public from terrorist attacks using commercial
aviation.  If the specific datasets are disclosed, potential
terrorists could use that knowledge to develop effective
countermeasures and circumvent detection.

55.  With regard to the 21 denied in full documents under
item 3 of DF-2012-00090, 11 one-page documents referred to as
"Deletion Issue Trackers," which are documents created by NCTC
to track if and when records in specific datasets were possibly
not deleted on time in accordance with the agreement with the
data provider agency (including information on the date the
issue was identified, the date the record(s) was due to be
deleted, the date the record(s) was actually deleted, the number
of records deleted, the exposure of access, and a brief
description of the issue), were denied in full because they
contained information, including the names of specific datasets
and data provider agencies, that must be protected because they
contain sensitive and/or classified sources and methods
information for the same reasons as indicated in the previous
paragraph.

56.  Four documents, totaling eight pages, that were
located with regard to item 3 of DF-2012-00090 and can be
referred to as "Deletion Issue Reports," which are documents
created by NCTC to track and describe (in greater detail than

deletion issue trackers) the facts, the dataset(s) involved, the law/policy/procedure(s) implicated, how and by whom it was discovered, and the actions taken, were denied in full, like the deletion issue tracker documents, because they contained information, including the names of specific datasets and data provider agencies, that must be protected because they contain sensitive sources and methods information for the same reasons as indicated in paragraph 54 above.

57. Six documents, totaling 19 pages, that were located with regard to item 3 of DF-2012-00090 can be referred to as "Deletion Issue Tracker Emails," which are email messages sent and received by NCTC officers within NCTC to track and describe the facts, the dataset(s) involved, how and by whom it was discovered, and the actions taken, when NCTC is notified that a dataset was possibly not deleted within the time frame authorized under the agreement with the dataset provider agency. These six emails constitute "initial" reports of "potential" incidents that had not yet undergone any type of formal review, nor had they been confirmed by NCTC's compliance team to in fact constitute incidents.  These documents were denied in full, like the deletion issue tracker and report documents, because they contain information, including the names of specific datasets and data provider agencies, that must be protected because they

34

contain sensitive sources and methods information for the same reasons as indicated in paragraph 54 above.

58.   In addition, information on six documents – two 'Deletion Issue Trackers' and two 'Deletion Issue Reports' (item 3 of DF-2012-00090), "Counterterrorism Data Layer (CTDL) : Status of Data Ingestion of Track 3 Datasets, October 2011," and "Counterterrorism Data Layer (CTDL): Datasets Ingested for Evaluation for Ingestion Pursuant to Track 3 of the NCTC Specific USP Guidelines, October 2011" (DF-2012-00059) – that was protected and withheld pursuant to FOIA Exemption 3 was done so under the auspices of 31 U.S.C. § 5319 (as well as the National Security Act), which relates to records and records of reports filed under the Bank Secrecy Act that are specifically exempted from disclosure under FOIA.

59.   Furthermore, in addition to sources and methods information protected pursuant to FOIA Exemption 3, the ODNI is also protecting ODNI employees' names, email addresses, and phone numbers pursuant to FOIA Exemption 3.  This information was protected on 17 documents and is being withheld pursuant to the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g, as amended (the "CIA Act"), which is applicable to the ODNI through Section 102A(m)(1) of the National Security Act of 1947, 50 U.S.C. § 403-1(m)(1), as amended.

60.    Section 6 of the CIA Act, which has long been held to be an Exemption 3 statute, provides that the CIA shall be exempted from the provisions of "any other law" (in this case, FOIA) which requires "the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . ."  Among other things, this provision allows the CIA to withhold employee names and personal identifiers, including email addresses.

61.    Section 102A(m)(1) of the National Security Act, as amended, provides that:

> In addition to the authorities under subsection (f)(3), the Director of National Intelligence may exercise with respect to the personnel of the Office of the Director of National Intelligence any authority of the Director of the Central Intelligence Agency with respect to the personnel of the Central Intelligence Agency under the Central Intelligence Agency Act of 1949 (50 U.S.C. § 403a *et seq.*), and other applicable provisions of law, as of the date of the enactment of this subsection to the same extent, and subject to the same conditions and limitations, that the Director of the Central Intelligence Agency may exercise such authority with respect to personnel of the Central Intelligence Agency.

62.    As a result of Section 102A(m)(1), the ODNI can rely on the CIA Act to withhold ODNI information that falls within the statute, including the employee names, phone numbers, and email addresses to the same extent that this information is withheld by the CIA.

36

**D. FOIA EXEMPTION 5**

63.   FOIA Exemption 5, 5 U.S.C. § 552(b)(5), protects inter-agency or intra-agency communications protected by certain privileges, including the deliberative process privilege.

64.   Information was withheld pursuant to FOIA Exemption 5 on 24 of the 29 documents at issue.   The withheld material includes information contained within intra-agency documents, emails and reports that discuss compliance issues related to the AG Guidelines.

65.   *Deliberative Process Privilege.*   FOIA Exemption 5 exempts from disclosure pre-decisional, deliberative material protected by the deliberative process privilege.   The deliberative process privilege protects the internal deliberations of the government by protecting from disclosure those recommendations, analyses, and discussions prepared to inform or in anticipation of decision-making.   The integrity of the government's deliberative process, not just the documents themselves, is protected by this privilege.   Information is protected under the deliberative process privilege if it is both pre-decisional and deliberative.

66.   I have determined that the information withheld on 24 documents in this case under FOIA Exemption 5 is protected by the deliberative process privilege because it contains

37

information that reflects the pre-decisional deliberations of
ODNI employees, including the proper handling of compliance
issues related to the AG Guidelines.  Specifically, on the three
documents released in part in plaintiff's request #DF-2012-
00059, information on the third page of the documents titled
"Counterterrorism Data Layer (CTDL): Datasets Ingested or
Identified for Evaluation for Ingestion Pursuant to Track 3 of
the NCTC Specific USP Guidelines, October 2011" and
"Counterterrorism Data Layer (CTDL): Status of Data Ingestion of
Track 3 Datasets, October 2011," relate to datasets that, at the
time, were "targeted" for negotiations with data provider
agencies.  Those dataset names were included on these documents
because NCTC was still deliberating whether or not to continue
discussions with data provider agencies for possible ingestion
into the CTDL.  NCTC, however, ultimately decided not to ingest
some of those datasets and therefore the names of those datasets
were pre-decisional and deliberative in nature and were properly
protected.  On the third document responsive to plaintiff's
request #DF-2012-00059, information was protected under FOIA
Exemption 5 because it again relates to names of datasets that
were "targeted" for negotiations with data provider agencies, as
well as datasets to be "researched" to determine feasibility of
ingestion.  It further details deliberative discussions with

potential data provider agencies.  As such, all of the information protected under FOIA Exemption 5 in these documents is pre-decisional and deliberative in nature and was properly withheld.

67.  With regard to the 21 denied in full documents under item 3 of plaintiff's request #DF-2012-00090, the descriptions of which were detailed in full, *supra*, the documents are not considered "final" versions.  Those 'compliance incident' type documents were never formally reviewed by the multiple NCTC components tasked with the oversight of access to datasets, but were merely notifications to the NCTC compliance team of issues that have occurred and that required further review.  During such review, ODNI components, including the NCTC Civil Liberties and Privacy Office and NCTC Legal, interview personnel, review documentation – including these initial incident report documents – in order to ascertain whether an incident has in fact occurred, and if so, the root causes of such incident and potential measures that can be implemented by NCTC to minimize the risk of recurrence in the future.  Within the context of these reviews, these documents may be edited to elaborate on additional relevant details, refined to clarify facts and remove potential ambiguities, and on occasion, be edited to correct information initially included in a report which, through the

review process, appeared to be erroneous.  As such, these
documents were (and continue to be) subject to change until a
full review is concluded and a final compliance review is
completed and issued by the NCTC compliance team.  Assessments
of the factual details of these potential compliance incidents
and required coordination with other relevant agencies are
continuing.  The documents were withheld on deliberative process
grounds because they should be considered 'drafts' that include
and involve pre-decisional deliberative discussions among ODNI
employees regarding possible approaches to take with respect to
potential deletion incidents; candid internal discussions and
exchanges of opinion among ODNI staff regarding these issues;
and recommendations for actions.  This kind of back and forth
exchange is vital to ODNI employees who must feel free to
provide information and analysis to other officials so that they
can make fully informed and quality decisions.  Furthermore,
revealing pre-decisional draft and deliberative material that
has not undergone the rigors of a complete intra-agency review
process could cause public confusion by revealing premature
opinions, recommendations, and conclusions that may conflict
with the final compliance review report.  If ODNI employees have
to be concerned about the public disclosure of these documents,
they might be more circumspect and less candid and frank in

their recommendations to other ODNI officials, which would be extremely detrimental to the internal decision making process of the ODNI.

68.  Because the officials involved in these pre-decisional deliberations expected that their candid discussions, personal opinions, and recommendations would remain confidential, the release of this information would discourage open and frank discussions among ODNI employees in the future, thereby threatening the confidence needed to ensure the candor of future deliberations.  As such information is properly exempt in its entirety under FOIA Exemption 5, there is therefore no reasonably segregable information available for disclosure.

**E. FOIA EXEMPTION 6**

69.  FOIA Exemption 6 provides that FOIA does not require the production of records that are:  "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  FOIA's protection of personal privacy is not impacted by the type of record in which an agency stores its information.  FOIA Exemption 6 is designed to protect information in official Government records, even if the information is not embarrassing or of an intimate nature.

70.   In this case, the ODNI withheld information on three of the four documents responsive to item 2 of plaintiff's request #DF-2012-00090, and 13 of the 22 documents relating to item 3 of plaintiff's request #DF-2012-00090 pursuant to FOIA Exemption 6.   The withheld information includes the names of ODNI employees, their room numbers, email addresses and phone numbers[9].

71.   Specifically, in the document titled "NCTC GUIDELINES: Understanding Acquisition, Retention, and Dissemination of USP Information and other issues in EO 12333," ODNI employees' names, phone numbers, room numbers and email addresses appears on one of the 32 pages.   In the document titled "Data Access and Use, NCTC," an ODNI employee's name and phone numbers appears on one of the 66 pages.   In the document titled "NCTC Civil Liberties and Privacy Office, Protection of Privacy and Civil Liberties," an ODNI employee's name, phone numbers, room number and email addresses appears on two of the eight pages.

72.   In all six of the 'Deletion Issue Tracker Emails', all four of the 'Deletion Issue Reports', and three of the 'Deletion Issue Tracker' documents relating to item 3 of plaintiff's request #DF-2012-00090, ODNI employees' names, phone numbers and email addresses was protected and withheld.

_____

[9] The government employee information being withheld pursuant to Exemption 6 is also being withheld pursuant to Exemptions 2 and 3.

73.   The ODNI employees identified in the documents have a significant privacy interest in the withheld information; the public interest in the disclosure of the withheld information is negligible at best; and the disclosure of the individuals' information would constitute a clearly unwarranted invasion of their personal privacy.

74.   The ODNI is required to balance the public interest in disclosure against the privacy interest of the individual.  ODNI employees, who are considered national security personnel, have a heightened privacy interest due to the nature of their work. Publicly disclosing their names and other identifiable information, including phone numbers, could subject them to unnecessary public scrutiny, contact via unsolicited phone calls and/or emails, harassment, hostility from those who object to particular policies that they are merely carrying out, or possibly even targeting by foreign intelligence services, all of which would compromise their ability to perform their jobs. This information is not fundamental to understanding the operations or activities of the U.S. Government.  Even if some minimal public interest can be found in disclosure of the personal information at issue, the balance would still tilt dramatically against disclosure.  Since the strong privacy interests involved outweigh the negligible public interest, if

any, in disclosure, the ODNI has properly withheld the information under FOIA Exemption 6.

### F. FOIA EXEMPTION 7(E)

75.   FOIA Exemption 7(E) provides that FOIA does not require the production of records that are:  "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

76.   In this case, the ODNI withheld information pursuant to FOIA Exemption 7(E) on the three documents released in part in response to plaintiff's request #DF-2012-00059, and on all of the 21 denied in full documents processed in regard to item 3 of plaintiff's request #DF-2012-00090.  The withheld information includes the names of sensitive and/or classified datasets and the names of data provider agencies.

77.   NCTC is an important component of the ODNI.  Although NCTC is not a "law enforcement agency," it does perform work related to law enforcement investigations or prosecutions.  NCTC was established in Section 119 of the National Security Act, as

amended, 50 U.S.C. § 404o.  The primary missions of the NCTC are as follows:

(1)  To serve as the primary organization in the U.S. Government for analyzing and integrating all intelligence possessed or acquired by the U.S. Government pertaining to terrorism and counterterrorism, excepting intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism.

(2)  To conduct strategic operational planning for counterterrorism activities, integrating all instruments of national power, including diplomatic, financial, military, intelligence, homeland security, and law enforcement activities within and among agencies.

(3)  To assign roles and responsibilities as part of its strategic operational planning duties to lead Departments or agencies, as appropriate, for counterterrorism activities that are consistent with applicable law and that support counterterrorism strategic operational plans, but shall not direct the execution of any resulting operations.

(4)  To ensure that agencies, as appropriate, have access to and receive all-source intelligence support needed to execute their counterterrorism plans or perform independent, alternative analysis.

(5)  To ensure that such agencies have access to and receive intelligence needed to accomplish their assigned activities.

(6)  To serve as the central and shared knowledge bank on known and suspected terrorists and international terror groups, as well as their goals, strategies, capabilities, and networks of contacts and support.

50 U.S.C. § 404o(d).

78.  Furthermore, one of the many duties and responsibilities of the Director of NCTC is to "develop a

strategy for combining terrorist travel intelligence operations
and law enforcement planning and operations into a cohesive
effort to intercept terrorists, find terrorist travel
facilitators, and constrain terrorist mobility." 50 U.S.C.
§ 404o(f)(1)(F).  NCTC does this, in part, by operating the
Terrorist Identities Datamart Environment ("TIDE"), which is the
U.S. Government's central repository of information on
international terrorist identities.  TIDE supports the U.S.
Government's various terrorist screening systems or "watchlists"
and the IC's overall counterterrorism mission.  Federal agencies
nominate individuals for inclusion in TIDE based on evaluations
of intelligence and law enforcement terrorism information.  NCTC
exports a sensitive but unclassified subset of the data
containing the terrorist identifiers to the Terrorist Screening
Center on a transactional basis for use in the U.S. Government's
consolidated watchlist.  This consolidated watchlist, which is a
critical tool for homeland security, supports screening
processes to detect and interdict known and suspected terrorists
at home and abroad.  Disclosure of the datasets used by NCTC in
conducting the analysis and developing the factual basis for
watchlisting or screening decisions would disclose techniques
and procedures for law enforcement activities and
investigations.

79.   Intelligence gathering is an essential law enforcement activity.  Given NCTC's mission to directly support the counterterrorism efforts of all U.S. Government agencies, including those responsible for enforcing criminal, civil and regulatory provisions (e.g., DOJ, FBI, and DHS), and by compiling records and conducting analysis to support law enforcement investigations by analyzing terrorist threats and identifying terrorist targets, the ODNI can and properly did withhold information in its records that relate to those functions of NCTC.  The release of information about NCTC's use of certain datasets would reveal the details of techniques and methodologies used by NCTC that are not generally known to the public and could potentially assist criminals and terrorists in taking steps to reduce the effectiveness of NCTC's analytical methods and techniques and diminish the quality of its analysis and reporting of terrorist leads to law enforcement organizations.

80.  NCTC performs a unique service of common concern to the intelligence and law enforcement communities by integrating all-source intelligence related to terrorism and counterterrorism and serving as the central and shared knowledge bank on known and suspected terrorists and international terror groups.  The Director of NCTC is responsible for using this all-

source knowledge to develop effective strategies to combine

terrorist travel intelligence operations with law enforcement

planning and operations into a cohesive effort to intercept

terrorists attempting to enter the United States, to prevent

violence in the homeland, to identify individuals who facilitate

terrorist travel, and finally to develop initiatives based on

the intelligence data to constrain terrorist mobility.  If known

or suspected terrorists gained insights into what datasets are

routinely reviewed by NCTC to develop essential information

concerning a known or suspected terrorist, that knowledge will

clearly assist them in efforts to develop tactics, techniques

and procedures for evading detection at international ports of

entry or when transferring funds into the United States from

foreign banks and financial institutions.  Terrorist

organizations have demonstrated the capacity to gather and

analyze information in the public domain and the ability to

deduce U.S. intelligence methods and processes from that

information.  If the specific datasets are disclosed, potential

terrorists would use that knowledge to identify system

vulnerabilities and gaps as they seek alternative means to gain

access to the United States and to securely transfer funds to

support terrorist operations in this country, nullifying the

future effectiveness of these analytic and investigative

measures and rendering them operationally useless.  Such information is therefore properly exempt from disclosure under FOIA Exemption 7(E).

81.  A line-by-line review of all 29 documents was performed and all reasonably segregable, non-exempt information has been disclosed.


V.   <u>CONCLUSION</u>

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 10th day of May, 2013.


Mark W. Ewing
Chief Management Officer
Office of the Director of National Intelligence

49