**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | ) )  ) ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:12-cv-1282-JEB |
| | ) |
| OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE | ) ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff the Electronic Privacy Information Center ("EPIC") opposes Defendant Office of the Director of National Intelligence's ("ODNI") May 10, 2013 Motion for Summary Judgment, and Cross-moves for Summary Judgment in favor of EPIC. EPIC disputes the agency's assertion of certain FOIA exemptions. EPIC also seeks an order compelling ODNI to conduct a segregability analysis with regard to the documents the agency has withheld in full and to release the segregable portions or, in the alternative, for the court to conduct *in camera* inspection of the documents in dispute to determine whether they may be properly withheld in full.

## FACTUAL BACKGROUND

On March 22, 2012, the New York Times reported that Attorney General Eric Holder had signed new guidelines for the National Counterterrorism Center ("NCTC"), which would relax restrictions on how counterterrorism analysts may retrieve, store, and

search information about Americans.[1] The Washington Post corroborated this story on

the same day.[2] These new guidelines allow the NCTC to make complete copies of entire

databases held by other federal agencies that are subject to the Privacy Act of 1974, and

to mine those databases using complex algorithms.

The New York Times article referred to a "priority list" that was developed by the

NCTC, which set forth a list of databases that the agency planned to copy in their

entirety. However, officials declined to say which databases were included on this list.

In order to assess the privacy risks of the new guidelines and to determine whether

the agency program complied with the Privacy Act, on March 28, 2012, EPIC sent a

Freedom of Information Act request ("EPIC's FOIA Request") to ODNI for "'the priority

list' of databases that the National Counterterrorism Center plans to copy." EPIC requested

"News Media" fee status, based on its well-established status as a "representative of the

news media." *EPIC v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Additionally,

EPIC asked for fee waiver. *Id.*

On March 29, 2012, ODNI acknowledged receipt of EPIC's FOIA request and

assigned the request reference number DF-2012-00059. DHS made no determination on

EPIC's fee waiver request or on its "news media" fee status. On June 8, 2012, EPIC

appealed ODNI's failure to respond to the request within 20 days ("EPIC's First FOIA

Appeal"). EPIC also renewed its request for "news media" fee status.  On June 15, 2012,

ODNI acknowledged receipt of EPIC's First FOIA Appeal.

---

[1] Charlie Savage, *U.S. Relaxes Limits on Use of Data in Terror Analysis*, N.Y. Times, Mar. 23, 2012, at A1, *available at* http://nytimes.com/2012/03/23/us/politics/us-moves-to-relax-some-restrictions-for-counterterrorism-analysis.html?_r=1
[2] Sari Horwitz and Ellen Nakashima, *New Counterterrorism Guidelines Permit Data on U.S. Citizens to be Held Longer*, Wash. Post, Mar. 22, 2012, *available at* http://www.washingtonpost.com/world/national-security/new-counterterrorism-guidelines-would-permit-data-on-us-citizens-to-be-held-longer/2012/03/21/gIQAFLm7TS_story.html?wprss=

On June 15, 2012, EPIC transmitted, via facsimile, a second Freedom of Information Act request ("EPIC's Second FOIA Request") for records related to Section (B)(2) of NCTC guidelines. Section (B)(2)(a) details the process by which the NCTC can obtain and copy datasets from other federal agencies, and Section (B)(2)(d) establishes the procedures by which the heads of departments or agencies can raise objections to the NCTC's requests for data. Specifically, EPIC asked ODNI to disclose:

1. Terms and Conditions and related documents, as described in Section (B)(2)(a) of the NCTC Guidelines;

2. All documents related to disputes between department and agency heads and DNI, as described under Section (B)(2)(d) of the NCTC Guidelines.

EPIC requested "News Media" fee status, based on its well-established status as a "representative of the news media," *EPIC v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), and for fee waiver. *Id.* EPIC also asked ODNI to expedite the response to EPIC's Second FOIA Request as it pertained to a matter about which there is an urgency to inform the public about an actual federal government activity, and was made by a person primarily engaged in disseminating information. 5 U.S.C. § 552(a)(6)(E) (2011). On July 5, 2012, ODNI acknowledged receipt of EPIC's FOIA request and assigned the request reference number DF-2012-00091. On July 19, 2012, EPIC appealed ODNI's failure to respond to EPIC's Second FOIA Request within 20 days (EPIC's Second FOIA Appeal). EPIC also renewed its request for "news media" fee status and for expedited processing. On August 14, 2012, ODNI acknowledged receipt of EPIC's Second FOIA Appeal.

Also on June 15, 2012, EPIC transmitted, via facsimile, a third Freedom of Information Act request ("EPIC's Third FOIA Request") for records regarding

acquisition of databases from other intelligence agencies, as described in the NCTC guidelines. Specifically, EPIC asked ODNI to disclose:

1.  The guidelines and mechanisms for the correction or documentation of "inaccuracy or unreliability of [] information, and supplement incomplete information to the extent additional information becomes available;"

2.  Training materials used to "ensure that [] personnel use the datasets only for authorized NCTC purposes and understand the baseline and enhanced safeguards, dissemination restrictions, and other privacy and civil liberties protections they must apply to each such dataset;"

3.  Any information or documentation related to abuse, misuse, or unauthorized access of datasets acquired by NCTC (as indicated by the monitoring, recording, and auditing described in Section (C)(3)(d)(3));

4.  Written determinations by the Director of NCTC or designee regarding "whether enhanced safeguards, procedures, and oversight mechanisms are needed."

EPIC requested "News Media" fee status, based on its well-established status as a "representative of the news media," *Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), and for fee waiver. *Id.* EPIC also asked ODNI to expedite the response to EPIC's Third FOIA Request as it pertained to a matter about which there is an urgency to inform the public about an actual federal government activity, and was made by a person primarily engaged in disseminating information. 5 U.S.C. § 552(a)(6)(E) (2011). On July 5, 2012, ODNI acknowledged receipt of EPIC's FOIA request and assigned the request reference number DF-2012-00090.

Also on June 15, 2012, EPIC transmitted, via facsimile, a fourth Freedom of Information Act request ("EPIC's Fourth FOIA Request") for records regarding NCTC legal memoranda. Specifically, EPIC requested "any guidelines or legal memoranda discussing NCTC's understanding and interpretation of the following standards used in

the NCTC Guidelines discussed above: 'reasonably believed to constitute terrorism information,' 'reasonably believed to contain terrorism information,' and 'likely to contain significant terrorism information.'"

EPIC requested "News Media" fee status, based on its well-established status as a "representative of the news media," *EPIC v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), and for fee waiver. *Id.* EPIC also asked ODNI to expedite the response to EPIC's Fourth FOIA Request as it pertained to a matter about which there is an urgency to inform the public about an actual federal government activity, and was made by a person primarily engaged in disseminating information. 5 U.S.C. § 552(a)(6)(E) (2011). On July 5, 2012, ODNI acknowledged receipt of EPIC's FOIA request and assigned the request reference number DF-2012-00092. ODNI also denied EPIC's request for expedited processing. On July 19, 2012, EPIC appealed ODNI's failure to respond to EPIC's Fourth FOIA Request within 20 days ("EPIC's Third FOIA Appeal"). EPIC also renewed its request for "news media" fee status and for expedited processing.

On August 1, 2012, EPIC filed this action. ODNI answered on October 1, 2012. Shortly afterward, the parties agreed to limit the scope of EPIC's FOIA Requests. The modifications stipulated that EPIC's FOIA Requests would be limited to "records related to the revised NCTC guidelines of March 2012," and that EPIC's FOIA Requests would be limited to "documents that are final and not predecisional or deliberative in nature." This second stipulation expressly excluded, however, any responsive documents to EPIC's request for "any information or documentation related to abuse, misuse, or unauthorized access of datasets acquired by NCTC (as indicated by the monitoring, recording, and auditing described in Section (C)(3)(d)(3)."

On December 14, 2012, ODNI released seven pages of partially redacted documents from three responsive records ("First Interim Response"). On February 12, 2013, ODNI released about 160 pages from four responsive documents ("Second Interim Response"). On March 11, 2013, ODNI released five pages from one document ("Third Interim Response"). In total, ODNI released fewer than 200 pages of partially redacted records from 8 documents, and withheld in full another 21 documents.

As set forth below, EPIC challenges the propriety of the agency's withholding of 21 documents in their entirety.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B).

The U.S. Supreme Court "repeatedly has stressed the fundamental principle of public access to Government documents that animates the FOIA." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989). "In enacting FOIA, Congress struck the balance it thought right--generally favoring disclosure, subject only to a handful of specified exemptions--and did so across the length and breadth of the Federal Government." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1266 (2011). As the Court has previously explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against

6

corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dept. of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976), quoting S. Rep. No. 89-813, at 3 (1965). The FOIA was meant to be a "disclosure statute," not a "withholding statute." *See Milner,* 131 S. Ct. at 1262

## ARGUMENT

### I.    ODNI Has Not Released All Segregable Portions of Documents

ODNI withheld 38 pages of responsive material, taken from 21 documents, in their entirety. Eleven of these records are "one-page documents described as 'Deletion Issue Trackers,'" which "describe instances where 'records in specific data-sets were possibly not deleted on time.'" Dkt. 11 at 9. Four of the records, "totaling eight pages, are described as 'Deletion Issue Reports,'" which "describe instances where records were possibly not deleted on time, but go into greater detail." *Id*. Finally, six documents, "totaling 19 pages, are described as 'Deletion Issue Tracker emails,' and are a version of the 'Deletion Issue Trackers' used for issues considered to be less consequential than those in 'Deletion Issue Trackers.'" *Id*. With respect to the above-mentioned documents, ODNI failed to provide the required detailed justification to withhold non-exempt material as non-segregable. "Requiring a detailed justification for an agency decision that non-exempt material is not segregable will not only cause the agency to reflect on the need for secrecy and improve the adversarial position of FOIA plaintiffs, but it will also enable the courts to conduct their review on an open record and avoid routine reliance on *in camera* inspection." *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242,

261-62 (D.C. Cir. 1977) (noting also that "It is neither consistent with the FOIA nor a wise use of increasingly burdened judicial resources to rely on *in camera* review of documents as the principal tool for review of segregability disputes").

Without more, ODNI simply reveals the category of documents that it withheld, and recites the language of the FOIA to justify its withholding. These exemptions may be properly asserted to select portions of the withheld documents, but the agency must segregate all non-exempt portions of those documents. 5 U.S.C. § 552(b). A "detailed justification for an agency decision that non-exempt material is not segregable" is an important requirement of FOIA that "not only cause[s] the agency to reflect on the need for secrecy and improve adversarial position of FOIA plaintiffs, but it also enable the courts to conduct their review on an open record and avoid routine reliance on *in camera* inspection." *Mead* 566 F.2d at 261-62.

## A.  ODNI Has Wrongly Withheld Records Under Exemption 3

The Supreme Court has established a two-prong standard of review for Exemption 3. *Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990). "First, is the statute in question a statute of exemption as contemplated by exemption 3? Second, does the withheld material satisfy the criteria of the exemption statute?" *Id.* (internal citations omitted). Whether section 102A(i)(1) of the National Security Act of 1947 and the Bank Secrecy Act, 31 U.S.C. § 5319, qualifies as statutes of exemption under exemption 3 is not at issue. At issue here is whether the materials withheld by ODNI under these statutes "satisfy the criteria of the exemption statute."

### 1.  The Material Withheld by ODNI Does Not Satisfy the Criteria for Exemption Under 50 U.S.C. § 403-1(i)(1)

Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. §

403-1(i)(1) states that "the Director of National Intelligence shall protect intelligence

sources and methods from unauthorized disclosure." In order for information to qualify

for exemption under 50 U.S.C. § 403-1(i)(1), it must be specifically covered by this

provision. *See CIA v. Sims*, 471 U.S. 159, 167 (1985). Explicitly, "[i]n its affidavits, the

Agency must show specifically and clearly that the requested materials fall into the

category of the exemption." *Hayden v. National Sec. Agency/Central Sec. Service*, 608

F.2d 1381 (D.C. Cir. 1979). "The agency bears the burden of proving that the withheld

information falls within the exemption it invokes." *EPIC v. NSA*, 678 F.3d 926, 932 (D.C.

Cir. 2012) (citations omitted). ODNI must prove that the information in the documents

withheld constitute intelligence methods and/or sources.

The documents referenced in the Ewing Declaration at ¶ 37 c.ii-iv that were

withheld in full under Exemption 3 per 50 U.S.C. § 403-1(i)(1) are not "intelligence

sources and methods" within the meaning of the statute. ODNI withheld "Deletion Issue

Trackers," "Deletion Issue Reports," and "Deletion Issue Tracker Emails" (hereinafter

"Deletion Tracker documents"). Ewing Declaration at ¶ 37.c.ii-iv. These documents "are

used to evaluate instances in which 'records in specific datasets were possibly not deleted

in time" (in accordance with an agreement with a data provider agency) . . . ." Def. MSJ

Br. at 22 (citing Ewing Decl. at ¶¶ 55-57).

In other words, these documents themselves are not the source of intelligence nor

encompass the method of gathering intelligence; thus, the agency "bears the burden of

proving the applicability of claimed exemption[]." *ACLU v. U.S. Dep't of Defense*, 628

F.3d 612, 620 (D.C. Cir. 2011). The claim that the Deletion Issue documents "would

seriously degrade the overall effectiveness of U.S. counterterrorism activities" is not

logical or plausible. *See Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)

("Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it

appears 'logical' or 'plausible.'" (citations omitted)). It is not clear from the ODNI's brief

or the Ewing Declaration how documents on failures to timely delete information from

certain databases constitutes an intelligence source or method.

### 2. Insofar as Exemption 3 under 50 U.S.C. § 403-1(i)(1) is Applicable, ODNI Still Must Release the Non-Applicable Portions

According to the agency, the Deletion Tracker documents "consists entirely of

information containing sensitive and/or classified sources and methods information,

specifically including dates that records were obtained and deleted by NCTC, the number

of records deleted, and information about who has access to the dataset and the nature of

the issue." Def. MSJ Br. at 22. The agency continues, "even the release of pieces of

information on these documents, innocuous thought they may seem individually, 'would

assist adversaries in piecing together bits of information that would provide insights into

the particular sources and methods relied upon by NCTC analysts.'" Def. MSJ Br. at 22

(citations omitted).

If Exemption 3 is applicable at all, it is not applicable to the entirety of the

Deletion Tracker documents withheld by ODNI. The only information arguably

connected to intelligence sources and methods are the names of specific datasets and the

names of data provider agencies. These two specific pieces of information are also the

only ones the Ewing Declaration specifically argues are intelligence sources and

methods. The defense argues that knowing the names of specific datasets and the data

provider agencies could provide "the means to piece together sensitive and/or classified

information in order to determine the nature and scope of an IC agency's classified

intelligence interest in particular U.S. person information related to terrorism." Ewing

Decl. at 31. None of the other information contained within the Deletion Tracker

documents is connected to intelligence sources and methods. *See* Ewing Decl. at  ¶¶ 51-

62.

  The date the issue was identified, the date the records were due to be deleted, the

number of records deleted, the exposure of access, and the brief description of the issue

are all information that does not fall under intelligence sources and methods. These

details do not "logically fall within the statutory exemption." *See Military Audi Project v.

Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). ODNI merely concludes, without explaining,

that the dates, number of records deleted, exposure access, and the brief description of the

issue are "protected because they contain sensitive and/or classified sources and methods

information." Ewing Decl. at ¶ 33.

  "An agency withholding responsive documents from a FOIA release bears the

burden of proving the applicability of claimed exemptions." *ACLU v. U.S. Dep't of

Defense*, 628 F.3d 612, 620 (D.C. Cir. 2011). That burden for Exemption 3 includes

"describ[ing] the justifications for nondisclosure with reasonably specific detail [to]

demonstrate that the information withheld logically falls within the claimed exemption."

The date the issue was identified, the date the records were due to be deleted, the number

of records deleted, the exposure of access, and the brief description of the issue all lack

any logical or plausible connection to protecting intelligence methods and sources. *See

Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). The defendant "must

demonstrate that the withheld materials are covered by that particular statute" not merely

conclude that they do. *See People for the American Way Foundation v. NSA/Central Security Service*, 462 S.Supp.2d 21, 28 (D.C.C. 2006) (citing *CIA v. Sims*).

### 3. The Material Withheld by ODNI Does Not Satisfy the Criteria for Exemption Under 31 U.S.C. § 5319

In addition to the Deletion Issue documents withheld by ODNI under the National Security Act, the agency withheld four of the Deletion Issue documents (2 Deletion Issue Trackers and 2 Deletion Issue Reports) under the Bank Secrecy Act, 31 U.S.C. 5319. Again, at issue is not whether the Bank Secrecy Act qualifies as a statute of exemption under exemption 3, but whether the materials withheld by ODNI "satisfy the criteria of the exemption statute."

The Bank Secrecy Act "make[s] information in a report [on monetary transactions] available to an agency, including any . . . United States intelligence agency . . . ." 31 U.S.C. § 5319. Under the Act, "a report and records of reports are exempt from disclosure . . ." *Id.*

With respect to the Deletion Issue documents withheld under the Bank Secrecy Act, the ODNI has failed to "show specifically and clearly that the requested materials fall into the category of the exemption." *Hayden v. National Sec. Agency/Central Sec. Service*, 608 F.2d 1381, 1390 (D.C. Cir. 1979). ODNI has merely concluded that four Deletion Tracker documents are exempted under 31 U.S.C. § 5319 because, according to the agency's conclusion, these documents "fall within the ambit of 31 U.S.C. § 5319." Def. MSJ Br. At 24 (citing *Ewing Decl.* at ¶ 58).

The Ewing Declaration similarly fails to meet the agency's "burden of proving that the withheld information falls within the exemption it invokes." *EPIC v. NSA*, 678

F.3d 926, 932 (D.C. Cir. 2012) (citations omitted). It is not clear from the ODNI's brief or

the Ewing Declaration how documents on failures to timely delete information from

certain databases constitutes bank information of the type exempted under the Bank

Secrecy Act.

### B.  The Agency Has Wrongly Withheld Records Under Exemption 5

Exemption 5 allows an agency, if it so chooses, to withhold "inter-agency or

intra-agency memorandums or letters which would not be available by law to a party

other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5). The exemption

is to be applied "as narrowly as consistent with efficient Government operation." *Pub.*

*Employees for Envtl. Responsibility v. U.S. Dept. of Interior,* CIV.A. 06-182(CKK), 2006

WL 3422484, 2006 U.S. Dist. LEXIS 85787 (D.D.C. Nov. 28, 2006); S. Rep. No. 89-813

(1965). To qualify, a document must satisfy two conditions: "its source must be a

Government agency, and it must fall within the ambit of a privilege against discovery

under judicial standards that would govern litigation against the agency that holds it."

*Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8 (2001).

### 1.  The Documents Do Not Qualify for the Deliberative Process Privilege Because They Contain Factual Information, Not Opinions, Recommendations, or Deliberations

In order for a document to be properly withheld under Exemption 5, "it must fall

within the ambit of a privilege against discovery under judicial standards that would

govern litigation against the agency that holds it." *Klamath Water Users*, 532 U.S. at 8.

Encompassed in Exemption 5 is the "deliberative process" privilege, which protects from

disclosure "documents reflecting advisory opinions, recommendations, and deliberations

that are part of a process by which governmental decisions and policies are formulated."

*Klamath Water Users,* 532 U.S. at 8. The purpose of the privilege is to protect "frank

13

discussions of legal or policy matters." *Environmental Protection Agency v. Mink*, 410

U.S. 73, 87, (1972) (finding that the justification for the deliberative process privilege is

that "[I]t would be impossible to have any frank discussions of legal or policy matters in

writing if all such writings were to be subjected to public scrutiny"); *Dow Jones & Co.,*

*Inc. v. Dept. of Justice*, 917 F.2d 571 (D.C. Cir. 1990) (confirming that "[w]e have said

that the purpose of Exemption 5 is to encourage the frank discussion of legal and policy

issues") (internal citations omitted).

　　Under the deliberative process privilege, factual information generally must be

disclosed, but materials embodying officials' opinions are ordinarily exempt. *Petroleum*

*Info. Corp. v. U.S. Dept. of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), *citing EPA v.*

*Mink,* 410 U.S. at 87-91 (endorsing the fact/opinion distinction); *Quarles v. Department*

*of Navy,* 893 F.2d 390, 392 (D.C. Cir.1990) (observing that "the prospect of disclosure is

less likely to make an adviser omit or fudge raw facts, while it is quite likely to have just

such an effect" on materials reflecting agency deliberations). "Purely factual reports and

scientific studies cannot be cloaked in secrecy by an exemption designed to protect only

'those internal working papers in which opinions are expressed and policies formulated

and recommended.'" *Bristol-Myers Company v. FTC,* 424 F.2d 935, 939 (D.C. Cir. 1970)

(quoting *Ackerly v. Ley,* 420 F.2d 1336, 1341 (D.C. Cir.1969)).

　　The Supreme Court has upheld this distinction, recognizing, "Virtually all of the

courts that have thus far applied Exemption 5 have recognized that it requires different

treatment for materials reflecting deliberative or policy-making processes on the one

hand, and purely factual, investigative matters on the other." *EPA v. Mink*, 410 U.S. at

89. The D.C. Circuit follows the fact / opinion distinction. *Playboy Enterprises, Inc. v.*

*Dep't of Justice*, 677 F.2d 931, 936 (D.C. Cir. 1982) (finding that the factual material in a government report was not protected under the deliberative process privilege and must be released); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858 (D.C. Cir. 1980) (holding that memoranda from regional counsel issued in response to requests for interpretations of regulations were not exempt under the deliberative process privilege because they were "straightforward explanations of agency regulations"), and District of Columbia courts have routinely held that factual materials are not protected from disclosure under Exemption 5. *See, e.g., Judicial Watch, Inc. v. U.S. Dept. of Treasury*, CIV.A. 09-01508 BAH, 2011 WL 2678930 (D.D.C. July 11, 2011) (holding that headers at the top of several sets of minutes were factual and, hence, segregable and must be released); *CREW v. DHS*, 648 F. Supp. 2d 152 (D.D.C. 2009) (holding that documents consisting of "factual information" must be disclosed because they were "quite plainly, not recommendations, drafts, proposals, suggestions or the like, reflecting 'the personal opinions of the writer,' nor do they reveal the 'give-and-take of the consultative process'" and stating that "It is well-established that the deliberative process privilege generally does not shield purely factual information from disclosure").

Courts have recognized that there is an important distinction between objective facts and subjective opinions. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d at 866 (D.C. Cir. 1980) (finding that "[t]he exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer").

The agency's own description of the "deletion issue trackers," "deletion issue reports," and "deletion issue tracker emails," indicates that at least large portions of these

are clearly factual, not "advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated." *Klamath Water Users,* 532 U.S. at 8. The agency is withholding these materials because these materials were "merely notifications to the NCTC compliance team of issues that have occurred and that required further review." Ewing Decl. at 39. The agency even acknowledges that these reports contain "factual details." *Id.* at 40. In fact, incident reports are routinely disclosed under FOIA. *See e.g. Antonelli v. Federal Bureau of Prisons,* 623 F.Supp.2d 55 (D.D.C. 2009); *Daisy Mfg. Co., Inc. v. Consumer Products Safety Commission,* 133 F.3d 1081, 1082 (8th Cir. 1998)(noting that the Commission was required to turn over incident reports).

Defendant's expansion of this doctrine would include not only discussions of policy, "advisory opinions, recommendations, and deliberations," *Klamath Water Users,* 532 U.S. at 8, but would sweep in purely factual documents and information, contrary to case law and the stated purpose of the Exemption. *See Petroleum Info. Corp.*, 976 F.2d at 1434 (D.C. Cir. 1992); S. Rep. No. 89-813 (1965). This is, quite simply, not the purpose or scope of this privilege, as set out by the Supreme Court. *See Klamath Water Users,* 532 U.S. at 8.

        **2.**    **Even if the Court Finds that Portions of the Documents Are Protected Under the Deliberative Process Privilege, the Unprotected Factual Portions Are Segregable and Should Be Released**

While some portions of the disputed documents may be properly withheld – for example, discussions between ODNI employees regarding how to respond to the incidents summarized in these reports, the facts contained in these reports are not "deliberative" and must be segregated and disclosed.  Even if the agency establishes that

it has properly withheld portions of these documents under FOIA Exemption 5, "it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. U.S. Dep't of Justice,* 642 F.3d 1161, 1167 (D.C. Cir. 2011); *North v. U.S. Dep't of Justice,* 774 F.Supp.2d 217, 222 (D.D.C.2011) (citing *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1178 (D.C. Cir. 1996)). The agency bears the burden of demonstrating that withheld documents contain no reasonably segregable factual information. *Mokhiber v. U.S. Dept. of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004), *citing Army Times Pub. Co. v. Department of Air Force,* 998 F.2d 1067, 1068 (D.C. Cir. 1993); *Mead Data Central,* 566 F.2d at 260. Here, the DHS has not clearly demonstrated in the Vaughn Index that the documents contain no reasonably segregable factual information.

Even if the Court finds that portions of these records contain "advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated," *Klamath Water Users,* 532 U.S. at 8, all segregable factual portions of the records must still be released. *See Roth v. U.S. Dep't of Justice,* 642 F.3d at 1167. As discussed above, the declaration presented by the Defendant contains many references to information that is most likely factual. Thus, even if the Court finds that there is a section of the "deletion issue report," for example, that contains an advisory opinion regarding what the agency should do about the incidents in question, the agency must still disclose the underlying factual information: the factual description of the incident.

### C.  ODNI Cannot Withhold Material Under the 7(E) Exemption

#### 1.  The D.C. Circuit Applies the 7(E) Exemption to "Law Enforcement Agencies"

As an initial matter, ODNI's concession that the NCTC is "not a law enforcement agency" should disqualify it from claiming Exemption 7 withholding in this Circuit. Ewing Decl. at ¶ 77. The D.C. Circuit has explained that Exemption 7 of the FOIA applies to "law enforcement agencies." *Pratt v. Webster*, 673 F.2d 408, 416 (D.C. Cir. 1982). The Court further explained that this designation includes both agencies whose "principal function is criminal law enforcement" and those which have "both law enforcement and administrative functions." However, it excludes agencies that do not have law enforcement authority. *Weissman v. CIA*, 565 F.2d 692, 696 (D.C. Cir. 1977). Thus, the 7(E) exemption did not apply to records of an extensive CIA investigation of American citizens living in the U.S., since the CIA is statutorily prohibited from conducting domestic law enforcement activities. *Id.*

Several other circuits have adopted this requirement as well. "The threshold issue in any exemption (7) claim is whether the agency involved may properly be classified as a 'law enforcement' agency. The term 'law enforcement purpose' has been construed to require an examination of the agency itself to determine whether the agency may exercise a law enforcement function." *Irons v. Bell*, 596 F.2d 468, 474 (1st Cir. 1979). *See also Church of Scientology of California v. U.S. Dep't of Army*, 611 F.2d 738, 748-9 (9th Cir. 1979). This background issue is crucial, because it defines the scrutiny with which the court may review an agency's assertion that its withheld records satisfy the requirements of Exemption 7. Depending on the prevalence of criminal law enforcement in the agency's mission, the Court will require "more exacting scrutiny for agencies whose principal function is not law enforcement." *Pratt,* 673 F.2d at 416. However, ODNI concedes explicitly that "NCTC is not a 'law enforcement agency,'" but instead performs

"'work related to law enforcement investigations or prosecutions[].'"  Ewing Decl. at ¶ 77. This admission should put NCTC on par with the CIA in *Church of Scientology*; without the authority to conduct "law enforcement activities," an agency may not withhold information under a statutory provision that protects records of "law enforcement activities."

### 2.   ODNI Misconstrues the Legal Standard for Applying Exemption 7(E)

Even if ODNI had not conceded that its mission falls outside the scope of Exemption 7(E), ODNI nevertheless misstates the "threshold issue" test that is required for an agency to claim Exemption 7 withholding in the D.C. Circuit. This Circuit requires that a "law enforcement agency" meet a three-pronged threshold test to determine whether it may withhold records under Exemption 7 generally. The agency must show that the material "(1) must be an 'investigatory record,' (2) must have been 'compiled for law enforcement purposes,' and (3) must satisfy the requirements of one of the six subparts of Exemption 7." *Pratt,* 673 F.2d at 413. Part (2) of the threshold test alone requires an additional test in the D.C. Circuit. An agency seeking to establish that its records have been "compiled for law enforcement purposes" must demonstrate that a "nexus" links "the agency's investigatory activities" and "the documents sought," and that this nexus is "based on information sufficient to support at least 'a colorable claim' of its rationality." *Pratt,* 673 F.2d at 421. In the instant case, however, ODNI only mentions part (2) of the test: "that the records at issue were compiled for law enforcement purposes," which it claims it may pass by satisfying the "substantial nexus" test. Def. MSJ Br. at 30. ODNI's misstatement of the rule reflects a fundamental misunderstanding

of the purpose of Exemption 7(E). The three parts of the threshold test articulated by the

D.C. Circuit are not independent requirements; they are interrelated and work together to

ensure that the agency uses the exemption properly. Thus, the "rational nexus" to

determine part (2) of the test relies upon a finding that the agency is withholding records

pertaining to an "investigation," as articulated in part (1).

Furthermore, in order to establish the "rational nexus," a "mixed agency" must

establish that the withheld material pertains to a particular target, or at least a particular

investigation. The D.C. Circuit has further explained:

> To satisfy this requirement of a "nexus," the agency should be able to
> identify a particular individual or a particular incident as the object of its
> investigation and the connection between that individual or incident and a
> possible security risk or violation of federal law. The possible violation or
> security risk is necessary to establish that the agency acted within its
> principal function of law enforcement, rather than merely engaging in a
> general monitoring of private individuals' activities.

*Pratt*, 673 F.2d at 420.

The D.C. Circuit reiterated this principle in *Birch*, noting that "in the context of a

mixed-function agency Exemption 7 embraces only 'investigations which focus directly

on specifically alleged illegal acts, illegal acts of particular identified officials, acts which

could, if proved, result in civil or criminal sanctions,'" and that "the purpose of the

investigation [i]s 'the crucial factor;' -that, to cross Exemption 7's threshold, the

information at issue must [be] gathered in the course of 'an inquiry as to an identifiable

possible violation of law.'" *Birch v. U.S. Postal Serv.*, 803 F.2d 1206, 1210 (D.C. Cir.

1986). *See also Rural Hous. Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73, 82

*supplemented*, 511 F.2d 1347 (D.C. Cir. 1974) ("The purpose of the 'investigatory files'

is thus the critical factor"); *Lurie v. Dep't of Army*, 970 F. Supp. 19, 36 (D.D.C. 1997)

("An agency investigation is considered to be for law enforcement purposes if it 'focuses "directly on specifically alleged illegal acts, illegal actions of particular identified officials, acts which could, if proved, result in civil or criminal sanctions"'").

This test was met when, for example, the Department of Health and Human Services withheld documents under Exemption 7(E) related to the investigation of a health care provider for HIPAA violations. There was no requirement that an actual crime existed – merely that the agency could show that it was directing its investigation toward "specifically alleged illegal acts." *Ortiz v. Dept. of Health & Human Services*, 70 F.3d 729, 732–33 (2d Cir.1995).

In this case, however, ODNI has not shown that the NCTC was conducting an "agency investigation for law enforcement purposes." ODNI has not demonstrated that the data withheld under 7(E) "focuses 'directly on specifically alleged illegal acts.'" Instead, it states that generally that "NCTC combines its efforts with those of intelligence agencies and 'law enforcement planning and operations' to 'intercept terrorists,' 'to constrain terrorist mobility,' and to disrupt terrorist financing." Def. MSJ Br. at 31. This kind of generality does not adequately describe to the court the kind of "specific allegations" required for an investigation to be withheld under 7(E). Therefore, even if ODNI had not conceded that it is not a law enforcement agency, ODNI's "rational nexus" justification would fail.

As with Exemptions 3 and 5, even if the agency establishes that it has properly withheld portions of documents under Exemption 7(E), "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b); *see also*

*Roth,* 642 F.3d at 1167; *North,* 774 F.Supp.2d  at 222 (D.D.C. 2011). "The agency bears

the burden of demonstrating that withheld documents contain no reasonably segregable

factual information." *Mokhiber*, 335 F. Supp. 2d at 69, *citing Army Times Pub. Co.,* 998

F.2d at 1068. *See also Mead Data Central, Inc.,* 566 F.2d at 260. Here, ODNI has not

clearly demonstrated in the Vaughn Index or through its declarations that the 21 entirely

withheld documents contain no reasonably segregable factual information.

## II.     EPIC Is Entitled To Recover Its Costs and Fees

### A.  EPIC "Substantially Prevailed" by Forcing Disclosure of ODNI Records

Irrespective of the outcome of the parties' cross-motions for summary judgment,

EPIC is entitled to recover its fees and costs from ODNI in this matter. EPIC asks the

Court to enter judgment as to EPIC's eligibility and entitlement to fees and to order

further briefing as to the amount of costs and fees. "The court may assess against the

United States reasonable attorney fees and other litigation costs reasonably incurred in

any case under this section in which the complainant has substantially prevailed." 5

U.S.C. § 552(a)(4)(E). "A complainant has substantially prevailed if the complainant has

obtained relief through … a voluntary or unilateral change in position by the agency, if

the complainant's claim is not insubstantial." *Id.* The determination of whether the

plaintiff has "substantially prevailed" is "largely a question of causation." *Weisberg v.*

*Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Church of Scientology v. Harris*,

653 F.2d 584, 587 (D.C. Cir. 1981). The key inquiry is "did the institution and

prosecution of the litigation cause the agency to release the documents obtained during

the pendency of the litigation?" *Church of Scientology*, 653 F.2d at 587.

EPIC has already "substantially prevailed" in this lawsuit. As described above and

in the Defendant's Motion for Summary Judgment, EPIC filed its FOIA requests

concerning the NCTC guidelines on March 28, 2012, and June 15, 2012. On June 8, 2012

and July 19, 2012 EPIC transmitted administrative appeals to ODNI, challenging the

agency's non-responsiveness and, in one case, the denial of "news media" fee status. On

August 1, 2012, EPIC filed this lawsuit challenging the agency's failure to comply with

the statutory deadline to reply to EPIC's appeals.

On December 14, 2012, only after the filing of this lawsuit, ODNI produced the

first substantive response to EPIC's FOIA Requests. On December 14, 2012, ODNI

released seven pages of partially redacted documents. On February 12, 2013, ODNI

released about 160 pages of partially redacted documents. On March 11, 2013, ODNI

released five pages. Finally, on May 8, 2013, ODNI released additional information from

two documents. "The institution and prosecution" of this suit plainly "cause[d] the

agency to release the documents obtained during the pendency of the litigation." *Id.*

## B.   The Court Should Award EPIC Costs and Fees In This Case

 "The court should consider [four factors] in determining the appropriateness of

an award of costs and attorney fees." *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir.

1977). The four factors are: 1) "the benefit to the public, if any, deriving from the case;"

2) "the commercial benefit of the complainant;" 3) "the nature of [the complainant's]

interest in the records sought"; and 4) "whether the government's withholding of the

records sought had a reasonable basis in law." H. Comm. on Gov't Operations and S.

Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of*

*1974 (Pub. L. No. 93-502) Source Book,* 189-90 (J. Comm. Print 1975).

"Public benefit" can be demonstrated by a "newsman who seeks information to be used in a publication or the public interest group seeking information to further a project benefitting the general public." *Davy v. C.I.A.*, 550 F.3d 1155, 1158 (D.C. Cir. 2008). The "public benefit" factor supports an award where the complainant's victory is "likely to add to the fund of information that citizens may use in making in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (citations omitted). D.C. District Court has found that news media coverage is relevant for determining "public benefit." *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.,* 811 F. Supp. 2d 216, 233-34 (D.D.C. 2011).

EPIC's FOIA suit provided substantial benefit to the public. EPIC maintains two of the most popular websites in the world - www.epic.org and www.privacy.org - for searches on the term "privacy." EPIC disseminated the agency records it received on its www.epic.org web site[3] and to the approximately 8,000 recipients of its bi-weekly newsletter.[4] Following EPIC's FOIA work in this matter, the updates to the NCTC Guidelines were widely covered in *The Wall Street Journal*, as well as several other publications.

> The rules now allow the little-known National Counterterrorism Center to examine the government files of U.S. citizens for possible criminal behavior, even if there is no reason to suspect them. That is a departure from past practice, which barred the agency from storing information about ordinary Americans unless a person was a terror suspect or related to an investigation.
>
> Now, NCTC can copy entire government databases—flight records, casino-employee lists, the names of Americans hosting foreign-exchange students and many others. The agency has new authority to keep data about innocent U.S. citizens for up to five years, and to analyze it for

---

[3] http://epic.org/foia/odni/epic_v_odni.html
[4] http://epic.org/alert/epic_alert_2004.html

suspicious patterns of behavior. Previously, both were prohibited. Data about Americans "reasonably believed to constitute terrorism information" may be permanently retained.

Julia Angwin, "U.S. Terrorism Agency to Tap a Vast Database of Citizens," *Wall Street Journal*, Dec. 13, 2012.[5]

The documents obtained by EPIC were also covered in detail in a *Huffington Post* article earlier this year.  With regard to the training course materials, the *Huffington Post* reported:

> "Only a CT (counter-terrorism) analyst can determine whether data constitutes terrorism information," the electronic training course for new National Counterterrorism Center analysts states. "There is no requirement that the analyst's wisdom be rock solid or infallible."

> The document, identified by its introduction as a "rules of the road" course on data access and use, is marked "SECRET." But it was released in a significantly redacted form to the Electronic Privacy Information Center under a Freedom of Information Act request on Tuesday, in response to a lawsuit filed in August 2012.

Matt Sledge, "National Counterterrorism Center's 'Terrorist Information' Rules Outlined In Document," *Huffington Post*, Feb. 15, 2013.[6] *See also* Greg Miller, "Plan for hunting terrorists signals U.S. intends to keep adding names to kill lists," *The Washington Post*, Oct. 23, 2012;[7] Bob Unruh, "Setback for Secret Big Brother Database," World Net Weekly, Oct. 19, 2012;[8] Charlie Savage, "U.S. Relaxes Limits on Use of Data in Terror

---

[5] http://online.wsj.com/article/SB10001424127887324478304578171623040640006.html
[6] http://www.huffingtonpost.com/2013/02/15/national-counterterrorism-center-nctc-terrorist-information_n_2697190.html
[7] http://www.washingtonpost.com/world/national-security/plan-for-hunting-terrorists-signals-us-intends-to-keep-adding-names-to-kill-lists/2012/10/23/4789b2ae-18b3-11e2-a55c-39408fbe6a4b_print.html
[8] http://www.wnd.com/2012/10/setback-for-secret-big-brother-database

Analysis" *New York Times*, Mar. 22, 2012;[9] Matthew Pate, "Permitting Big Brothers to compare notes," *Hawaii Tribune Herald*, Aug. 14, 2012.[10]

"Commercial benefit to the complainant" might preclude an award if the beneficiary is a "large corporate interest (or a representative of such an interest)." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. However, commercial benefit does not bar recovery "where the complainant was indigent or a nonprofit public interest group." *Id.* EPIC is a 501(c)(3) non-profit public interest research center. *EPIC,* 241 F. Supp. 2d at 5. EPIC derived no commercial benefit from its FOIA requests or lawsuit.

The "nature of the [complainant's] interest" factor is "closely related [to] and often considered together" with the commercial benefit criterion. *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992) Favored interests are "scholarly, journalistic or public-interest oriented." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. *See Long v. IRS*, 932 F.2d 1309, 1316 (9th Cir. 1991) (holding that a lower court's ruling that the plaintiff's scholarly interest weighed against her recovery of fees was held "wrong as a matter of law and an abuse of discretion"). As set forth above, EPIC's interest in this matter is squarely within the "scholarly, journalistic or public-interest oriented" interests favored by the statute. *See, e.g., EPIC v. United States Dep't of Homeland Sec.,* 760 F. Supp. 2d 4, 44 (D.D.C. 2011) ("[EPIC's] aims, which include dissemination of information regarding privacy issues to the public, . . . fall within the scholarly and public-interest oriented goals promoted by FOIA, . . .")

---

[9] http://www.nytimes.com/2012/03/23/us/politics/us-moves-to-relax-some-restrictions-for-counterterrorism-analysis.html?_r=2&hp&#p[WaiWai]

[10] http://hawaiitribune-herald.com/sections/commentary/their-views/permitting-big-brothers-compare-notes.html

ODNI did not have a "reasonable legal basis" for failing to disclose records to EPIC. ODNI's delay in replying to EPIC's requests and appeal plainly violated the FOIA's statutory deadlines. *See* 5 U.S.C. § 552(a)(6)(A). As described in EPIC's Complaint, ODNI violated statutory deadlines by failing to make a timely determination concerning EPIC's administrative request and appeal. ODNI has cited no legal basis in opposition to EPIC's claims regarding the untimeliness of the agency's response – in fact, ODNI has not attempted to account for the delay at all. The agency explains how it responded to EPIC's FOIA requests but avoids addressing its violation of the statutory deadline.

In this case, EPIC was forced to sue ODNI in order to obtain critical information concerning the NCTC's priority list, guidelines, training materials, memoranda, and legal interpretations. ODNI had no reason or legal basis to withhold these records. The agency must reimburse EPIC for its costs and fees.

## CONCLUSION

As discussed above, Defendant's Motion for Summary Judgment should be denied. The Court should order Defendant to undertake a proper segregability analysis and disclose all segregable documents. In addition, Plaintiff is entitled to recover its costs and fees because it has "substantially prevailed" in this case regardless of the outcome of the parties' cross-motions for summary judgment.

Respectfully submitted,

MARC ROTENBERG (DC Bar # 422825)

_____/s/ Ginger P. McCall_____
GINGER P. MCCALL (DC Bar # 1001104)
JULIA HORWITZ[*]
JERAMIE SCOTT[**]

Electronic Privacy Information Center
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff*

Dated: June 14, 2013

---

[*] Ms. Horwitz is barred in the State of Maryland. Her DC Bar application is pending.
[**] Mr. Scott is barred in the State of New York. His DC Bar application is pending.